Thank you, your honor. Good morning, and may it please the court. My name is Jennifer Yolanda Garcia, and I represent the petitioner appellant Leroy McGill in this matter. In this case, trial counsel was ineffective in presenting mitigation on Mr. McGill's behalf at sentencing for two distinct reasons. The first reason was because she was actively prevented from in her office. The second reason was because of unreasonable strategic decisions that Ms. Schaefer made on Mr. McGill's behalf. Starting with the first topic, the supervisors in Ms. Schaefer's office at the time of Mr. McGill's trial refused to allow her to obtain necessary experts in this case. Most importantly, they prevented her from being able to obtain an methamphetamine addiction, which of course was crucial in the events of this crime. In fact, I would go so far as to say that methamphetamine addiction might be the most important issue that should have been presented on Mr. McGill's behalf. Mr. Garcia, my understanding is she selected Dr. Beckman. Dr. Beckman at some point said he wasn't going to testify because your client wouldn't confess his guilt. But the financial arrangements that had already been made for Mr. Beckman presumably could have been transferred to another person like Dr. French. How do you deal with that as opposed to her office barring her from getting someone new? Your Honor, my understanding from Ms. Schaefer's testimony that the testimony and the affidavit she provided during the state post-conviction proceedings was that she was authorized by her office to retain Dr. Beckman. And when Dr. Beckman informed her that he was unable to assist, she was not authorized to switch to a different expert. Is there anything in the record that specifically says that after Dr. Beckman declined to testify absent Mr. McGill's confessing guilt that the office would not permit her to use the same funds that they had already authorized for Dr. Beckman to hire Dr. French or someone else? I don't believe, Your Honor, that there is evidence that Ms. Schaefer went back to her office and said, Dr. Beckman can't help me. Can I have funds for someone else? Which is certainly something that she should have done. I don't think there's any question that that is something she should have done. Her testimony and affidavit were clear that she also recognized that Mr. McGill's addiction was a crucial factor in this case. So again, as I said, this is a combination of factors here. I think there's the actions of her office that prevented her from acting effectively. But there were also unreasonable decisions made by Ms. Schaefer as well. Counsel, economics is always a constraint. Whether you have a private counsel who is working with the funds that the family can provide, whether you have a CJA appointment, or somebody else, somebody's going to monitor this. The funds are not unlimited. So how do we balance that against counsel's obligation? If there's ineffective assistance of counsel here, it doesn't feel like it's Schaefer. It feels like it's Sherwood. But yet, Ms. Sherwood had the obligation of managing an entire office with a limited budget. Those constraints are inherent in the process. So where's the line here? Of course, Your Honor. And as a lawyer who's been in an office for the entirety of my career, I can tell you, of course, I understand those is when a lawyer is asking for something unreasonable, or a lawyer is asking for something that is unsupported by the evidence. The lawyer is asking for numerous experts on the same issue. It's not appropriate to draw a line and refuse to appoint an expert on an issue that is fundamentally necessary to the case. And whether that was the trial court, if this was private counsel in the trial court, or the Office of Public Funding had refused to provide funding for such an expert, or whether it was the head of a public office like this, it would still be ineffective. Because the methamphetamine issue in this case is so crucial. I mean, the victims in this case, the witnesses in this case, the defendant, everyone in this case was a methamphetamine addict. There's literally no part of this crime that was not touched by methamphetamine addiction. So to limit Ms. Schaffer to one expert who refused to help her, what was unreasonable? And it resulted in... So it's not just that he refused to help her. It's that he felt that in his professional judgment, that the fact that he wouldn't be truthful about it meant that he could not present testimony that would tie into the facts of the case. And then in the post-conviction hearing, the state court concluded that Mr. French's or Dr. French's statement wouldn't have added anything for essentially the same reason. He didn't evaluate Mr. McGill and it didn't tie into him. So why is that an unreasonable conclusion by the state post-conviction? Two things, Your Honor. First, I would say that yes, according to Ms. Schaffer's testimony, he refused to assist in this matter because Mr. McGill had not confessed the crime to him. And that's an impossible standard. That is a standard that if all experts adopted that, there would be very few experts who would be able to testify in death penalty cases. Because in many cases... But the testimony was supposed to explain the role of methamphetamine in the offense. If the defense is alibi and it didn't happen, how does that have any tie to... Your Honor, the relevance I think is clear by looking at the trial transcripts. This was a thing that was discussed repeatedly during the trial. I mean, again, all of the players in this case were methamphetamine addicts. They had lived together at various times in the same house, you know, sharing methamphetamine. That wasn't setting for this crime. And even if Mr. McGill had refused to discuss the specific events of the night of the crime, that does not mean that expert would not have been important, especially for the penalty phase, in order to discuss the effects of methamphetamine on Mr. McGill and his life and his relationship with his girlfriend. All of the events that led to the crime in this case. And the expert was not being called during the guilt phase to try to establish some sort of impulsivity defense at trial, something like that. The facts of the crime themselves were not as important for the penalty phase where... Why was it unreasonable for the post-conviction court to conclude that the very generic statements contained in Dr. French's report, which don't tie in to Mr. McGill specifically, didn't add enough? It was unreasonable, Your Honor, because when you look at the facts that Dr. French presents, first of all, I would agree with you that Dr. French did not spend a lot of time in his report. I mean, a few sentences discussing Mr. McGill in general. But the most important part was that Dr. French was able to, through his professional experience, his understanding of the literature and the scientific evidence surrounding methamphetamine addiction, that he was able to provide an understanding in his brief report, an understanding of how methamphetamine addiction happens and what symptoms do you see in people with methamphetamine addiction. And he laid those symptoms out in a bullet list, I think, in two separate places in his report. And many of the factors that he discussed are present in this case. And, you know, it's definitely true that, you know, lay witnesses can present evidence talking about somebody being a drug addict or using methamphetamine. But to a jury, especially weighing whether or not a defendant deserves to live or die, to a jury, having an expert be able to explain how ingestion of this drug is an addiction, that it's not simply a voluntary choice, that it's an addiction, and also how that drug specifically affects behavior is crucial. I mean, this is not a case where Mr. McGill has a lengthy history of prior violent behavior. In fact, he has no history of violence in his background. He doesn't have prior domestic violence convictions. His prior convictions were for a robbery that he committed pretending to have a gun. He didn't even have a real gun. I mean, it is clear that Mr. McGill does not have a violent nature. And so the fact that the events of this case were so shocking, it's crucial for the jury to be able to hear from an expert who can understand why Mr. McGill acted in this way and what would propel him to take the actions that he took that night. I want to be sure I understand correctly a couple of things. First of all, the state court suggested that this was a strategic decision by Ms. Schaefer. The way I read the record, she didn't make a strategic decision. It was really just Dr. Beckman refused to testify. If she made a mistake, it wasn't fair to get a new specialist. Is that your understanding? Yes, Your Honor, that's exactly my understanding. And she certainly on the record indicated that she knew the effects of meth were significant and very pertinent to this penalty phase, right? Yes, Your Honor. Yes, and certainly I think the evidence before the post-conviction court, I think really illustrates a lot of the deficiencies that were present in what Ms. Schaefer did present to the trial court. And, you know, this case is unusual. I'm not sure I've seen a case in my career where the day after a mental health expert testifies, the trial court made a statement on the record that his testimony had been reduced to a nullity. I think it's very clear from the trial court record that Dr. Lanyon was discredited here. And Ms. Schaefer's concerns about... Counsel, if he was, if Lanyon was discredited, he was discredited on facts that he was not aware of that Schaefer withheld from him. And she said that she withheld them from him for strategic reasons. I agree, Your Honor. She did say that. And those strategic reasons were unreasonable. That the fact that she had a report from Dr. Lanyon and she had also prepared him for his testimony, it was not a surprise to her that Dr. Lanyon intended to testify. Had she disclosed those facts to Dr. Lanyon, how would that have affected Dr. Lanyon's testimony? It would have improved it, certainly, Your Honor. How would it have improved it? Then he would not have testified at all about the questions of memory. He would have had very, very little to say. And Your Honor, I don't think that would have been a bad thing. Because when you look at the specifics of that particular issue, and the fact that his report relied heavily on the fact that Mr. McGill had reported to him that he did not recall the events of the prior convictions. But Ms. Schaffer and Ms. Kate both had evidence readily in their position that indicated that, at least previously, he had recalled those events quite clearly. But if Dr. Lanyon knew that McGill could recall the events, he almost would have had nothing to say at all. Well, certainly, Your Honor, he would not have testified about the uncorroborated prior head injury, and he would not have made his statements regarding the effects that he found that head injury had on Mr. McGill and his lack of memory. Because as is clear from his own report, when he did neuropsych testing on Mr. McGill, Mr. McGill did very well on the memory scales. So Dr. Lanyon's testimony on that point was not even consistent with the rest of his own report. So the fact that Dr. Lanyon had not been able to receive corroboration of the head injury and had not been corrected on this issue—again, that was plain from the face of his report—had not been corrected on this issue of Mr. McGill's lack of memory led him to testify to something that wasn't true. And because he testified to something that wasn't true, the state was able to easily discredit him. He was surprised with reading this evidence while he was on the stand, which certainly, I think, shook him up in his ability to respond to other questions. And it certainly can't be said that it's a reasonable strategic decision to put on an expert to testify falsely in a case. And Ms. Schaffer knew that she had evidence knowing that the statements that were in the conclusions that Dr. Lanyon was drawing were not true, that the evidence that it was based on were not true. One of the things that the Superior Court said, and I'm quoting, defendant recounted his prior crimes in detail on cross-examination as he did to the pre-sentence writer. That's not true, is it? It is not true, Your Honor. It doesn't apply at all to anybody. That's correct. That is correct.  Is it material? I believe it's absolutely material. I mean, that's a crucial issue in this case, the question of what his memory was of those things. And the court's relying, as it does in many instances here, the court is relying on facts that simply are not true. They're not present in the evidentiary record. And in many instances, the court's conclusions just simply mischaracterize what happened in the evidence that was before it. What I struggle with is, I think, part of what my colleague Vibey is struggling with, is in connection with Dr. Lanyon, the Superior Court clearly got the facts wrong with respect to McGill. But by the same token, if Schaefer had given the police report to Dr. Lanyon, I'm not sure what he could have added. Can you cite anything in the record that he could have said that might have helped Mr. McGill's case? Well, two things, Your Honor. First of all, I would say, you know, it is clear from the record, it's clear from Ms. Schaefer's affidavit and testimony that she never believed that Dr. Lanyon was the appropriate expert in this case. And we agree. He wasn't qualified to give expert testimony on the issues that were important here. I think, again, you know, it's clear from every expert who has evaluated Mr. McGill, who's done neuropsych testing, that Mr. McGill has minimal brain damage at best. And I think that's clear. So, forgive me for interrupting. So, are you saying then that actually having Lanyon at all was the error here? That was the IAC, not the fact that she didn't give him the police report? He just shouldn't have been on the stand at all? Is that what you're saying? You know, frankly, Your Honor, I do think that was an error. I think, you know, it's clear that Ms. Schaefer did not have another choice. She, at least from what her testimony was, was that she really believed that if she continued to press for additional experts that her job was in jeopardy. I mean, that's something that she testified to. You know, it seems clear she did not believe she had a choice except to go with Dr. Lanyon. Once she presented Dr. Lanyon, I do believe that she made grave errors that were unreasonable as far as her preparation of him. But it is clear, as she stated at length in the post-conviction hearing, he was not qualified in the areas that she needed an expert. She needed someone to talk about the dysfunctional and domestic violence relationship between Mr. McGill and his girlfriend. Most importantly... Can I just ask you to help me with what I consider to be the ultimate question here? You know, of course, that we are weighing this appeal under EDPA, which is a very difficult standard for someone in your position to overcome. The only way you can really do that is to find that the statute has been violated by the lower court and get to the noble review of the evidence. In this case, what is your best argument? You presented us two situations here, of course. You've got the Beckman, and then you've got Lanyon, and you've got your allegations about what Schaefer did or didn't do. In each case, the court below, or the courts below, made provable misstatements of fact. What is your best argument in either or both of these situations that they are material enough that we would be applying the noble review of those particular items? Your Honor, this case, this situation is exactly the type of situation that the courts are able to review, even despite the strictures of EDPA. But, you know, if you look, for example, at the most recent Supreme Court decision in the Koehler matter, which I am unfortunately too familiar with as counsel for Mr. Koehler, the court was very clear in that case that the EDPA relief is available only when fair-minded jurists could not disagree about the errors in the state court proceeding. And here, there's simply no way for a court to look at the mistakes that were made by the post-conviction court and not acknowledge that they were errors. But with respect, yes, they were errors, and yes, we get to the noble if they violate the statute. But, of course, materiality plays a huge role in whether that happens. What's your best argument that either or both of these situations that we've talked about, Dr. Beckman and then Dr. Lanyon, and Schaefer's role vis-a-vis them, are constitute material errors that get us, if you will, past EDPA's restrictions and lets us to review this on the noble? Your Honor, I think that the trial record itself is the best example here. That if the court, as it is required to do under Wiggins, the controlling case law in evaluating IAC claims, if the court looks at the weight of the totality of the available mitigation evidence in this case against what was actually presented at trial, it absolutely shows prejudice on Mr. McGill's behalf. This is, again, in my experience, this is an unusual case. The prosecutor was able to argue throughout trial that even questioned by the end of the penalty phase, the prosecutor was on methamphetamine at the time of the crime. The prosecutor was able to effectively characterize and minimize the traumatic childhood that Mr. McGill had. The prosecutor, again, as we've already talked about, the trial court acknowledged that the prosecutor was able to nullify Dr. Lanyon's testimony. When you look at the actual mitigation evidence that exists in this case, including the fact that at this point, after the trial, at least two experts have diagnosed Mr. McGill with dependent personality disorder, which certainly explains the nature of his relationship with Ms. Hardesty. Most importantly, the evidence of his drug addiction and the methamphetamine and how the methamphetamine affected Mr. McGill and the choices that he made, these are crucial elements and things that the jury absolutely deserves to hear. How would the PCR court's errors with respect to Bexson and Lanyon have helped you on the dependent personality disorder, which is the Hardesty point? It would be because, again, the PCR court really gave no credit to Dr. Rosengart. Dr. Rosengart, in the PCR proceedings, was the first person to bring up the fact that Mr. McGill had the dependent personality disorder. These experts... Who should have diagnosed the dependent personality disorder in the original proceedings? Bexson? Lanyon? Hoycroft? Who would have done that? This feels like a jump shift in your argument. No, no. It's not, Your Honor. Hoycroft, I think, is a good example of this. She's somebody who, could have discussed the issues in this case. Hoycroft could have discussed dependent personality disorder? Well, the key is that she could have discussed the aspects of addiction that played into that. Right, but somebody would have had to have diagnosed dependent personality disorder. Who was appropriate to do that? Yes, that would have been Dr. Ferraro, Your Honor, who was another expert that Ms. Schaefer requested to hire but was denied. So, Dr. Ferraro was the domestic violence expert that she asked her office for funding and was not given. So, she would have been the one to be able to explain that part of the relationship. Can I switch, just for a moment, to one of the uncertified issues that has concerned me? In this particular case, the Supreme Court's ring versus Arizona was handed down on June 24th 2002. The murder took place on July 13th 2002 and the statute enacted by the state of Arizona to address the sentencing issue covered by ring versus Arizona became effective on August 1, 2002. Under those circumstances, could an Arizona trial court have sentenced Ring to death? Mr. McGill, no, Your Honor. McGill, I apologize. Mr. Ring. Ring already had his time. His proceedings are over. No, and that's certainly the crux of our argument on this issue is that at the time the crime was committed in this case, there was no active statute for Mr. McGill to have and the new one had not yet gone into effect. And that fact alone distinguishes this case from all the other cases that find these changes in statutes to be not ex post facto. That's what's concerned me. I, of course, read the Arizona Supreme Court's statement in this case. Basically, we already decided that it was sentenced. But the cases that it dealt with involved people who had been sentenced under the prior statute before Ring versus Arizona went to the Supreme Court. And in that same Supreme Court case, and I'm going to quote this, the Supreme Court quoting the Arizona Supreme Court said a defendant convicted of first degree murder in Arizona cannot receive a death sentence unless a judge makes a factual determination that a statutory aggravating factor exists. Without that critical finding, the maximum sentence to which the defendant is exposed is life imprisonment and not the death penalty. So if that's accurate, that was I think originally came from Justice O'Connor. If that's accurate, then since Ring versus Arizona, if you will, eliminated the ability of a trial judge alone to make the determination about aggravating and mitigating circumstances, does that mean that the most that Mr. McGill could have been sentenced to when the crime was committed was life imprisonment? Yes, Your Honor. That is the case. At the day of the crime, there was no process or statute in place by which Mr. McGill could have received the death penalty. And most importantly, I think the cases that discuss this, like for example in Daubert, one of the issues they talk about is notice that at the time of the crime was the defendant on notice that there was an active death penalty statute in the state. And in this case, at the time of the crime, there was no active death penalty statute in this case. So he could not have had notice. You could actually argue that he had noticed there wasn't one. Exactly, Your Honor. Yeah, I guess I'm really troubled by the fact you've got some very capable jurists on the Supreme Court and everybody seems to just kind of make light of this issue. But I'm frankly troubled. I'm going to be asking Ms. Bennett to comment on that when we get to her because based on what I read from the Supreme Court, it does not appear that at the date of the murder, there was in effect in Arizona a statute that permitted someone to be sentenced to death. So that's why I wanted to get your response. I mean, obviously you'd be in favor of that interpretation, but it's a tough issue. It's a tough issue. It is, Your Honor. And to be clear, Mr. McGill is the only person who's on death row in Arizona whose crime was committed during this time period. So it would only affect him. And that's what makes it unique. I mean, everybody else seems to have committed the murder before Ring versus Arizona. Whereas Miguel committed it during this very brief time period after the Supreme Court's decision and before the Arizona legislature amended the statute. Yes, Your Honor. That's correct. I see my time is running out. You want to save some time? Yeah, that's okay. I'd like to reserve my remaining time for a vote. That's fine. Do either of my colleagues have any questions before we let Ms. Yolanda Garcia go for now? No, thank you. Okay, very well. All right. Why don't we start with the ex post facto, if you don't mind. You heard what I said to her. What's your response to that? You're on mute, counsel. Yeah, your mute button is on. Sorry. It's still on. Still on. You see it, there's a little, if you go to the, there you go. Okay, there we go. I apologize, Your Honor. Let's move our time back to 30 minutes. Hold on one second. Can the clerk hear us? There we go. Okay, start again now, please. Thank you, Your Honor. As you stated, this is an uncertified issue, but regardless, I do think that Daubert v. Florida addresses this issue squarely, that it doesn't matter whether the procedural change to whether it was the judge or the jury who determines the capital sentencing. But with respect, I know that's what the Arizona Supreme Court went on, was the procedural aspect. But in this case, the question I have is, what was the statute that existed on the date of the murders that would have permitted at that date an Arizona trial judge to sentence Mr. McGill to death? Well, he was on notice because the first degree murder statute specifically stated that he was, the eligible penalties were But that statute refers to the other statute that talks about the mitigation and aggravating circumstances. It's not in isolation. You've got to tie those two together, do you not? You can. It specifically does say what the possible punishments are. And then it says, I think in a separate section, what statute it refers to. And that statute obviously was still you know, that the legislature had to be able to obviously bring repeal. Let me go back. I apologize for interrupting. But let's just assume the Arizona legislature had not enacted the new statute. Could Mr. McGill have been sentenced to death? If the legislature had not changed it, so the judge didn't determine aggravating and mitigating circumstances, but rather the jury, they didn't do that. Let's just say they didn't. And I have your ring. Could Mr. McGill have been sentenced to death? I don't think so. If there was never anything to correct that statute. And I agree with you. So what we've got now is a statute a person who commits murder during the period after Ring v. Arizona in the Supreme Court and the date that the legislature made its effective, which I gather was August 1. So you have a gap. It may be that he's the lone straggler here. He doesn't fit into it. I find it difficult to understand why what the legislature did in his case would have been procedural. He would not have been able to be sentenced to death without what they did. It enhanced his ability to die. He would have otherwise, under what the Supreme Court said, he would have gotten a life sentence. Would he not? Yes. But with all due respect, Your Honor, I believe that all of the people who were free sentenced under the ring would not have been eligible if it were those people. As I understand, there were 32 or whatever. Every one of those people had committed the murder before the Supreme Court struck down the Arizona statute that allowed a judge to make these determinations. Only McGill, so far as I can tell, is in this hybrid situation. And you indicated, and I agree with you, that he, without the Arizona legislature having amended their law to take into account what the Supreme Court said in Ring v. Arizona, he could not have been sentenced to death. So I don't know that I believe he was on notice that he was subject to death because he could not have been sentenced to death if the Arizona legislature had not amended the law. What am I missing? I think you're missing the aspect that he gets a pass. And he was on notice because it did say that the possible punishments were life and death. And so that's the notice that he was required to have. I thought you just agreed that without the Arizona legislature's amending of the statute, he could not have been sentenced to death. Didn't you say that? If the legislature had never amended it. Correct. Because there would be no way to do it. Whatever notice he had, I mean, we all know this is illegal fiction. He didn't even know about any of this stuff. But the reality is, had he known what the law was after Ring v. Arizona on the day he committed the murder, he would know that if the Arizona legislature had not amended the statute, he could not have been sentenced to death. He would have had life in prison. Right? If the Arizona legislature had not amended the statute, then yes. Okay. So that's what he was on notice of. So then the only question is, once the legislature makes this change, clearly the state Supreme Court has said that with respect to the people committed murders before Ring v. Arizona, the Supreme Court version, that's procedural as to them because they knew when they were sentenced, they had a valid law. Mr. McGill arguably did not. So why would he be treated the same as the people who committed the murders prior to the Supreme Court's Ring v. Arizona case? I just don't see the difference because he was on notice. The statute said what he was facing. There was the statute that said how it used to be. And so just because he happened to commit his crime during the brief time period in which between when Ring came down and the legislature was able to create a new law, basically it's anything more than procedural. Maybe I'm not hearing you correctly. I thought you said that if the Arizona legislature had not so amended the statute, he would not have been able to be sentenced to death. Let's just say that the Arizona legislature didn't amend the statute for five years. What would happen then? Would he have been able to be sentenced to death during that interim period? Your Honor, I'm not sure how to answer that. Well, it's either yes or no. I don't think so, but I'm not exactly sure. I agree with you. So if he couldn't be sentenced to death then because he didn't have this a mandatory process, and it's because what the law had said in Arizona without the, and I read it here, the lesser judge in this case, Strickendown, makes the factual determination that a statutory aggravating factor exists. Without that critical finding, the maximum sentence to which the defendant is exposed is life imprisonment and not the death penalty. That's what the U.S. Supreme Court cited with respect to how Arizona law works. So I'm troubled. I want you to convince me if I'm wrong. I'm troubled by the fact that the legislature made the change. When he committed it, there was no death penalty statute in effect in Arizona. That's what I'm troubled with. That's what he was on notice of. I just don't think that he needs to be on notice of exactly how somebody was going to determine whether or not he was eligible for it. That's what the Supreme Court talked about here and said that without that critical finding, which they could no longer make by a judge, the maximum penalty was life imprisonment. That's what the law was. It's true the legislature later changed this and the court said that's retroactive, but that's with respect to the people who were sentenced under the previous statute. This guy's in a weird situation. I get it. It's kind of a one-off sort of deal, but I'm troubled why this is not an ex post facto situation in his case. I think the biggest thing is that because the legislature did in fact change it within a reasonable amount of time, that it is just a procedural issue. How long could the legislature have waited to change the statute to still make it applicable to what Mr. McGill did? Two years? I don't know, but I don't think that less than 45 days is unreasonable and I also think that because it is a legal question. How does this case differ from Daubert? I mean, because in Daubert, the murders were committed before Fuhrman invalidated the Florida statute and then the Florida legislature amended the statute after Fuhrman and he was sentenced and tried under the new statute and the ex post facto was rejected. Am I reading Daubert correctly? Your Honor, I honestly don't remember all of the details of Daubert, so if that's your understanding, I trust you. I'm kind of relying on you to help us out through this and whether or not, because if I'm right in that, then it would seem that Daubert is controlling. My recollection of Daubert is that it was a similar situation in that that there was a change in the statute and that's why it was a procedural issue. But I honestly, I'm sorry, Your Honor, but I just don't remember the facts that well. I just wanted to go back and talk a few minutes about what Ms. Garcia said. She claimed that the defense attorney was not able to present the type of case that she wanted, but she was. She just wasn't able to use the specific experts that she wanted to and I do believe that she was able to get a lot of the information that she wanted to out of Dr. Lanyon as well as her mitigation specialist. The record does not say state whether she went back after Dr. Beckson said that he could not help her. The record does not state whether or not she went back to her supervisor to ask for a different addictionologist, but again, I don't think that was unreasonable because she was able to get some of that information from Dr. Lanyon and I do understand. Well, I want to ask about Dr. Lanyon and the preparation of him. How is it a reasonable strategic judgment to set him up basically to be belayed on cross-examination? I mean, this was an obvious bomb. He was led into saying something that was provably, readily provably false and his credibility was detonated in open court. How is that a reasonable judgment to allow an expert to be misled into, you know, going out on a limb that can be readily sawed off? Well, the reason why she did not provide that information to Dr. Lanyon was because she was concerned that her client had lied about having a child. And so, if Dr. Lanyon had... So, because she was concerned that he had, it might come out that he had lied about having a child, she instead set up the expert to reveal that he had lied about amnesia. And it's not that he lied about amnesia. He just didn't at the time that Dr. Lanyon interviewed him, he didn't recall the robberies. Are you, excuse me, I want to be sure I understand your answer to my colleague's question. Are you saying that Attorney Schaffer did not provide the police report to Dr. Lanyon because he had lied before in the pre-sentence report? Yes, that was her concern. Where is that in the record? Oh, I apologize, Your Honor. I don't have that. I looked for it and I didn't see it. I can provide that to you. That would be helpful. Thank you. I do know that it is in the record. She said that in her cross-examination on the PCR hearing. That she said she did not provide the police report because he had lied in providing the PSR. When the PSR was prepared, that's what you're saying? Yes. The reference, it's on excerpt 210 that I see in here. So Leroy had allegedly told the probation officer when she interviewed him that he had a child. And he, this was on one of the armed robberies and he needed to get out to be with that child and we couldn't prove that. So you were concerned that McGill may have fabricated that? Yes. So that was a strategic decision on your report? Yes. That's what I think you're referring to. Yes, Your Honor. Thank you. Okay. That applies to the police report? That was the pre-sentence report. Well, that's different. What I'm struggling with here is I thought you said that the fact that he lied on the pre-sentence report was the reason why Schaefer didn't provide the police report to Dr. Blaney. I'm not sure why she did not provide the police reports. Perhaps she did not think about them. I don't know. I'm not exactly sure. It certainly was not a strategic decision not to do it that at least would be substantiated in the record, right? It's silent on the police report. That's what I was asking about. And I just want to be clear that when the trial judge stated that Dr. Lanyon's opinion was that the prosecution's cross on him was very effective. He specifically said it was on the point of less discredited. That was entirely foreseeable. I mean, how is that not an effective assistance to put on an expert who can be destroyed like that? And it's obvious he can be. If you did any reasonable preparation of him and the avenues across examination, that was pretty obvious. It's not like she didn't know the facts that were used to cross examine him. No, that's true. She knew the facts, but she didn't make that determination because she was concerned that the fact that he lied to the pre-sentence report writer. And at that point, if he lied to the pre-sentence report writer, it could call into question Dr. Lanyon being able to believe anything that Miguel had stated to him. So there was a strategic reason for that. If Dr. Lanyon had known the true facts, what would he have said? He would have said that he did not have amnesia at the time. Perhaps he could not remember it when Dr. Lanyon interviewed Miguel, but it wasn't that he was in an alcoholic blackout and amnesia. Was there any reason to put Dr. Lanyon on the stand? Yes, your honor. He provided a lot of information. He did discuss the methamphetamine use and how that affected Miguel. He specifically stated that he was a chronic drug user and that all drug users use drugs to block out their feelings and they never learn to cope appropriately. That's exactly what happened in Mr. Miguel's case. He was able to tie that into it. He was able to tie in his troubled childhood, the fact that he did stay with this woman who did have some control over him. So there was a lot of information that Dr. Lanyon wasn't aware of. But Dr. Lanyon was not an expert in this and he didn't do more than give very generalized comments about the effects of meth in this case, did he? Well, he was able to state that Miguel was under the influence and that he was emotionally a little boy according to ER 569. That was what he testified to. If you compare that, for example, with what Dr. French said later on, of course, you know, great detail, medical background, why this was a problem, what it caused, what its impact would be on his reasoning ability, his ability to restrain himself, anger control, and so on. None of that came in through Dr. Lanyon, did it? Yes. On ER 566, he stated that meth makes people paranoid, actively paranoid, and seriously impairs their judgment. So that part did come in. The problem with Dr. French's report is that it was all general. It had nothing to do with Miguel specifically. And Dr. Lanyon was able to relate that specifically to Miguel. I have a question about the post-conviction court's ruling on this point. I didn't see a determination by the court that the impact of the failure to prepare Dr. Lanyon properly, assuming that it was outside the range of professional judgment at the first prong of Strickland. I didn't see a finding by the post-conviction report that that wasn't prejudicial. I don't think that they raised the issue of whether or not his preparation was ineffective, just the fact that she called him in general. And that was the issue. Well, I thought he did address the court did address the issue about his preparation. Because he does say in hindsight, Ms. Schaffer claims that he did a horrible job of preparing for his testimony and was not qualified for the task. But then I don't see a corresponding determination that that was not prejudicial as Strickland pronged too. So my question is, if we were to conclude that this was a problem, and then we had to turn to the second strong prong of Strickland, do we apply de novo review or reapplying the AEDPA filter? You would apply the AEDPA because he did say, state overall that there was no that McGill did not suffer any kind of prejudice. And even with all of this, well, that's because he thought that McGill had testified on cross examination, which of course, didn't actually inaccurate. Well, although it is actually inaccurate, I think it's fair that the court just misspoke when it wrote that because it's the fact that that McGill remembered this issue. That's the material fact. It's not that he testified on that he testified. There's nothing else in the record that indicates that the court thought that he testified. And so it's really just the issue that McGill was actually able to recall these events. That's the material fact. The district court did correctly hold that the state court reasonably determined the facts and applied the law in this case. And applied Strickland and its analysis and they found the state court found that the defense attorneys were neither deficient nor was he prejudiced in any perceived deficiencies. Miss Ellicott, let me ask you, in effect, the same question I asked to your colleague. You've got two situations here on the certified appeal, where you have the Dr. Beckman, who wouldn't participate because Mr. McGill refused to confess to guilt. And the court made a number of statements such as that that was Schaefer's decision. It wasn't. It was Beckman's decision. She didn't get a new person to step in and she knew it wasn't serious. Then you have Lanyon. Lanyon got, I think my colleague said he was belayed on cross-examination because he didn't have the police report. The court below also misspoke about what Schaefer did or didn't do. Why are these mistakes not sufficiently in terms of the statement of facts? Why are those statements not sufficient to throw us over into de novo review, in which case we would be considering whether any juror could have concluded if the proper evidence had been brought in that Mr. McGill should have been sentenced to life imprisonment rather than death. What's our yardstick here? Well, as far as Dr. Beckman, I mean, she could have called him. She just made the strategic decision not to. And so it's not that Beckman wouldn't testify. It's just that he would not have testified in a manner. I don't understand. With respect, what I want you to focus on is why don't we have a situation here where we really need to consider more evidence. We need to send it back to the district court and have a new evidentiary hearing, perhaps, to determine which we can under penholster in circumstances like this. Why isn't that the appropriate remedy here where the lower court simply misstated important facts about what people did, what they said, and which ultimately resulted in not getting testimony in about the effects of meth or certainly memory? Because the state court correctly held that there was no prejudice, that there was no. What do you mean there's no prejudice? How could it not be prejudicial? You don't get testimony in about meth use. I mean, you're a smart person. You know what that does. How could that not be prejudicial? This is a fact we're talking about penalty phase. My guilt, we're talking about whether he dies or is sentenced to life imprisonment. That's pretty prejudicial, I would say. Your Honor, I think that William C. Taylor is the one who settles this issue, and that is that McGill did not show that another expert would have changed the outcome. The fact that he was a chronic drug user and the effects of meth, that was brought out. I agree with you, except if you get to a de novo situation, then the stand flips around, and it's a question of whether any juror could have been influenced by that. Am I wrong? No, Your Honor, you're not wrong. But the problem is that the aggravating factors in this case are so overwhelming. He poured gasoline on two people and lit them on fire. The courts did state that his mitigation was not unsubstantial, but all of the evidence that he would like to bring in now is just cumulative. I don't think that he can show- You don't think that, I mean, I grant you, this is a horrible crime, terrible, terrible crime. If a person's brain is effectively fried from continuous meth use, so they have no judgment to speak of at all, even though he's guilty of the crime, doesn't state law provide that life imprisonment is one of the appropriate remedies as opposed to death? And isn't that now, of course, in the province of the jury? Your Honor, with all due respect, I think that the evidence of his meth addiction did come out at the penalty phase, as well as the fact that his brain is not average IQ, he doesn't have any brain damage. Yes, he is a chronic meth user, but the circumstances that you are trying to compare this to just don't exist in this case. And that is why- You're saying there was evidence that he had no brain problems? Correct. Even the new experts say that he did not have brain damage, and that he did have a normal IQ. So we just don't have those facts. If there are no further questions from the panel- Other questions by my colleagues? We would just ask- Very well, thank you, Ms. Bennett. So, Ms. Yolanda Garcia, you have a little bit of time for rebuttal. Yes, thank you, Your Honor. There's just a couple quick points I would like to make. First of all, just in response to what Ms. Bennett just stated about the fact that the methamphetamine did not cause brain damage. First of all, we don't know that for sure, considering the fact that, for example, the scan done by Dr. Wu, the testing done by Dr. Lanyon took place some period of time after the crime in this case. But most importantly, the issue about methamphetamine is not that Mr. McGill's methamphetamine addiction caused brain damage. That is not what the addiction expert would have talked about. The important thing is that the addiction expert would have discussed what effects the use of methamphetamine had on Mr. McGill and his behavior and his judgment the night of the crime. Meth addiction, I think there is some evidence that long-term, sustained use can result in brain damage, but those two things are not the same. So the fact that Mr. McGill does not have significant brain damage does not undermine the fact or counteract the fact that he had this long-standing methamphetamine addiction. The other point I'd like to make quickly is that Ms. Bennett mentioned that this additional mitigation evidence is cumulative, and that's a crucial issue in this case. One of the big problems that happened in the trial court here was that there was no corroboration. And so because of the lack of corroboration, because there was not expert testimony on these issues, because Dr. Lanyon was allowed to testify to things that were not corroborated, that is why the trial prosecutor was able to be so effective in undermining both Dr. Lanyon's testimony and the evidence put on by counsel. So this is not a question of putting on cumulative evidence. This is a question of putting on evidence that corroborates the statements made by the experts and the witnesses at trial. And that's a crucial difference here. Thank you, Your Honor. And I certainly would ask that the court consider this case and find that the state court made unreasonable determinations of fact here and result in de novo review for Mr. McGill. Can I ask my colleagues that either have additional questions for Ms. Yolanda Garcia? I don't. Thank you. Very well. Thanks to both counsel. We appreciate it. These are always tough cases. And I hope you don't feel we've been unduly harsh in our question, but we truly are trying to understand what the law requires in this situation. Your answers have been helpful to us. So thank you both. The case just argued is submitted and the court stands adjourned. Thank you, Your Honor. Court for this session stands adjourned.
judges: Bybee, M. Smith, Collins